Argued May 14; modified July 2; rehearing denied
September 3, 1946

## HURNER *v.* HURNER
(170 P. (2d) 720)

Charles W. Redding, Judge.

*William A. Martin* and *Roland Davis,* both of Port-
land (Davis, Herbring, DeMartini & Jensen, of Port-
land, on brief), for appellant.

*C. C. M. Peterson,* of Portland (Hurlburt & Peter-
son, of Portland, on brief), for respondent.

Before BELT, Chief Justice, and ROSSMAN, BAILEY,
BRAND and HAY, Justices.

HAY, J.

The parties to this case intermarried in January,
1920. They lived together as husband and wife for
twenty years. Early in 1940 they separated, and, on
July 17th of that year, they entered into an agree-
ment in writing in the nature of a property settle-
ment. The agreement divided between them the prop-
erty which they had accumulated during the marriage.
In the division, the plaintiff received the family home
in Portland, with furniture and equipment, and $1500
in cash. The defendant received certain stocks and
bonds, and an automobile. He assumed payment of
bills "on account of household or family expenses",
totalling $706.87. In the event that a decree of divorce
should thereafter be granted to either party, it was
stipulated that the husband should pay to the wife,
until she should remarry, $70 monthly for her support
and maintenance; that the wife should be given custody
of Frank Wilson Hurner, the minor child of the parties,
and that the husband should pay her $45 a month for
the support of such child. The agreement contained
the following paragraph:

> "The intent of this agreement is limited to de-
> fining the financial responsibilities, rights and ob-
> ligations of the parties hereto. The party of the

first part (the wife) agrees to accept the foregoing in full settlement and satisfaction of all her claims upon the party of the second part for alimony, support and maintenance, attorney's fees and suit money, if any, and as a separation and division of their properties, irrespective of any divorce being had between the parties.''

Thereafter, at the suit of the wife, the circuit court for Multnomah County, on July 30, 1940, entered a default decree dissolving the marriage. The husband made no appearance. The decree approved and adopted the property settlement.

On October 5, 1944, the defendant filed a motion to modify the decree by awarding him the custody of the child and relieving him of any further payments for maintenance of the plaintiff or for support of the child. In support of his motion, he submitted his own affidavit, in which he stated that, since the date of the decree, ''the conditions surrounding the parties * * * have materially changed in that the minor child of said parties has not received while in the custody of the plaintiff, the care, consideration and nurture that he should''; that the plaintiff ''has not been a fit and proper mother and companion to said minor'', but left home early in the morning and did not return until nine o'clock p. m., which obliged the child to ''prepare his own breakfast and shift for himself during the entire day''; that the child was required to work after school, on Saturdays, and during summer vacation months; that plaintiff refused to allow him to have the companionship of others of his own age; that, on several occasions, when the child remonstrated against such treatment, plaintiff became morose and moody, and threatened to take poison; that plaintiff, on many occasions, attempted, through false statements to the

child respecting his father, to turn the mind of the child against the latter; that, in July, 1944, the child arrived at his father's home in San Mateo, California, "worn out, tired, fatigued and extremely nervous", and wearing shabby clothes; that he refused to return to his mother; that, under the circumstances, defendant has retained the child in his custody and will give him better care than he has received from his mother. Further, the affidavit states that plaintiff is "in excellent health, strong of body, able and willing to work", is unmarried, is now gainfully employed, and has been employed almost constantly since the date of the decree.

The plaintiff countered by moving for a modification of the decree to increase her maintenance allowance to $100 a month and the allowance for support of the child to $50 a month. In support thereof, and in opposition to defendant's motion, she filed her own affidavit, in which she denied generally the allegations of defendant's affidavit, and alleged facts indicating that she had properly supported and cared for the child. She admitted having taken employment, pointing out that the amount paid her under the decree for her own maintenance and for the support of the child totaled only $115 per month, which, unless augmented by other means, was insufficient for those purposes. She alleged that, at the time of the filing of her affidavit, she was employed as a bulletin clerk in the Agricultural Extension Service, State College of Washington, that her hours of employment were from eight a. m. to 5 p. m., and that her salary was $130 per month. She admitted that she had allowed her son to do certain work after school hours, similar to that being done by all of his high school companions, and denied that such

work was too strenuous for him. She stated that, shortly after the decree was entered herein, she sold her Portland residence for about $5,000 and removed, with the child, to Pullman, Washington, where, in June, 1943, she purchased a home at a cost of $7,500. Up to that time, she said, her son appeared to have been completely happy and contented, and he took a great deal of pleasure in their new home. Her affidavit is supported, in part, by the affidavits of several citizens of Pullman, Washington, including her family physician, a clergyman, and school fellows of the child.

In reply, the defendant filed a lengthy affidavit by the minor child, in the form of a letter to the court, and an affidavit by a San Mateo physician. The boy's letter is an excellent composition for one of his years. It comprises a categorical support of his father's affidavit, is fulsome in praise of his stepmother, and expresses his determination never again to live with his mother. The physician's affidavit states that, since September, 1944, the boy had been a patient of his; that he had treated him for "an acute upper respiratory infection" (which, no doubt, means a cold in the head), from which he had completely recovered, and was in good health, with "no other abnormalities" except that he was "disturbed at the idea of being returned to another state"; that the doctor believes that defendant's home is a good environment for the boy, and that "he has not been influenced in his decision to live in San Mateo".

A hearing was conducted by the court upon the motion and countermotion, at which oral testimony was adduced by the parties. Upon this testimony, and upon the affidavits, the court, on February 26, 1945, made an order modifying the decree as prayed for by defendant. The plaintiff has appealed to this court.

■ It is contended that the defendant's agreement to pay plaintiff $70 a month for her maintenance was an integral factor in the division of the jointly accumulated property. It has been firmly established by the decisions of this court that if, in a property settlement between a husband and wife, which settlement is adopted and approved in a decree of divorce, the husband agrees to pay to his wife an allowance for her maintenance, as a restoration to the wife of property brought by her to the marriage, or as payment to her, by way of annuity, of her share or a portion of her share of jointly accumulated property, then it is beyond the power of the court to modify the decree either by reducing or by eliminating the maintenance allowance. *Phy v. Phy,* 116 Or. 31, 236 P. 751, 240 P. 237, 42 A. L. R. 588; *Simpson v. Simpson,* 154 Or. 396, 60 P. (2d) 936; *Warrington v. Warrington,* 160 Or. 77, 83 P. (2d) 479; *Prime v. Prime,* 172 Or. 34, 139 P. (2d) 550; *Briggs v. Briggs,* 178 Or. 193, 165 P. (2d) 772.

■ On the other hand, if the maintenance allowance is not an integral part of a property settlement, but is simply in the nature of permanent alimony, it is subject to modification by the court upon a showing of changed conditions. Section 9-915, O. C. L. A. The leading case upon the question is *Prime v. Prime,* supra, wherein the authorities are collated and carefully analyzed.

■ We find nothing in the property settlement agreement or in the evidence to support Mrs. Hurner's contention that the maintenance allowance was an integral part of the property division. She brought neither money nor property to the marriage, and, while she contributed to the joint accumulation, she

received a fair share thereof under the property settlement. The mere fact that the agreement recited that the wife accepted the settlement in satisfaction of all claims, "and as a separation and division of their properties", does not, in itself, establish the fact that the maintenance allowance was in liquidation of her actual property rights. *Prime v. Prime,* supra; *Phy v. Phy,* supra. On the contrary, the evidence shows conclusively that it was simply an agreement to pay alimony.

The only circumstances suggested by defendant as constituting a change of conditions since the decree, so far as plaintiff is concerned, are that the plaintiff is now in excellent health, is able and willing to work and to care for herself, is unmarried, and has been employed almost constantly. It does not appear from the evidence, however, that, at the time when the decree was rendered, the plaintiff was any less able to support herself than she has been at any time since. Indeed, if there is any change in her situation in this respect, it is for the worse, as she is several years older. Defendant testified that, at the time of the divorce, plaintiff was under treatment by a psychiatrist. It is conceivable that the condition which made such treatment necessary may have been induced by mental strain imposed upon her by her marital difficulties and the impending wreck of her home. She testified:

"* * * When my husband came home and told me that he didn't love me and wouldn't live with me any more I was utterly bereaved. I had loved that man for twenty years; he had been a devoted husband and father, but for some reason he became emotionally unstable and there was nothing that could be done about it, and when he requested it I granted the divorce. * * *"

In any event, defendant does not claim that, at that time, plaintiff's general health was not good, and, by his agreement that she should have the care of the child, we must assume that he conceded her mental fitness also.

■ By the property settlement, plaintiff received, as has been stated, a home in the city of Portland, valued at some $5,000, besides $1,500 in cash. She now has what is perhaps a slightly better home in Pullman, Washington, and $1,500 in war bonds. She earns about $130 a month. By renting two rooms in her home, she receives an additional $40 a month, but, out of this, she must pay taxes, insurance and repairs on the property. On the whole, we conclude that the evidence failed to show any material change of conditions as to her.

■ At the hearing, the defendant testified that his health had failed; that, for that reason, he had been obliged to cease working for his employer, Shell Oil Company; that he was receiving no salary from the company, and that he had no other income. It is to be noted that he made no such allegations in his motion or in the affidavit supporting it. The plaintiff was entitled to notice, by proper pleadings, of all of the grounds upon which defendant intended to rely for a modification of the decree. 27 C. J. S., Divorce, section 278b. He was not entitled to support his motion by other or additional grounds of which no such notice was given. However, as the evidence was received without objection, we shall assume that it was proper for the court to have considered it.

■ ■■ A husband who desires to be relieved of his family obligations, and whose wife has given him no grounds for divorce, is usually very willing, in order to

procure his freedom, to obligate himself to pay permanent alimony. That may have been the situation in the case at bar. The plaintiff testified: "Mr. Hurner was willing to make a settlement with me in order that he might have his freedom to have what he thought would be a more satisfying life." By his consent, expressed in the property settlement agreement, his obligation was embodied in the decree of divorce. Having taken to himself a new wife and assumed new family burdens, it was perhaps inevitable that in a few years he should begin to regard himself as a much abused person, and to feel that in equity the court ought to relieve him of the onerous burden which he had assumed. With the increasing prevalence of divorce, this has become almost routine procedure. Granting that a court of equity in a proper case should not hesitate to modify a maintenance allowance, when there has arisen a material change in the condition of the parties, affecting the ability of the one party to pay or the needs of the other to receive, nevertheless such modification should be made only after a thorough investigation by the court, and an adequate showing by the party seeking it. 17 Am. Jur., Divorce and Separation, section 651. In the present case, we think that the showing made by the defendant was insufficient. He was for a number of years assistant credit manager for Shell Oil Company for the Pacific Coast, including the eleven western states. He failed to disclose what salary he received, but, as the duties of his position were strenuous and exacting, no doubt his compensation was commensurate therewith and considerable in amount. Moreover, he is the beneficiary of some sort of retirement fund which the Shell Oil Company maintains for its employees. He appeared to be unwilling or unable

even to hazard an estimate of the amount which he may receive therefrom, and his testimony in that regard was not illuminating. His oral testimony indicated that he was virtually without means, but this was to some extent contradicted by allegations in his affidavit. Therein he stated that he has remarried and has established a home in California, and that, in such home, the boy will have all the means, care, attention to his eyes and general health, schooling, music, opportunity for recreation and play that should be accorded him in his station of life. Assuming that these statements were made in good faith, we think that they do not justify the inference that defendant is a man out of employment, ill, and without financial means, but rather that they imply that he is better able than the plaintiff, financially and otherwise, to provide a good home for his son. We think, moreover, that that was the impression which, by his affidavit, he sought to convey. In our opinion, the court should not have modified the decree with respect to maintenance of the plaintiff upon such an unsatisfactory showing.

 We now come to the question of the propriety of the change in custody of the child. The rule that the decree will not be modified in the absence of a satisfactory showing of a material change in circumstances is applicable here also. The decree in this respect is a final adjudication of the conditions existing at the time of its rendition. *Wells v. Wells-Crawford,* 120 Or. 557, 251 P. 263, 907; *Rasmussen v. Rasmussen,* 113 Or. 146, 231 P. 964; *Leverich v. Leverich,* 175 Or. 174, 152 P. (2d) 303; *Bartlett v. Bartlett,* 175 Or. 215, 152 P. (2d) 402; 19 C. J., Divorce, section 810. The welfare of the child is the criterion, and, even if a change in

conditions affecting such welfare is shown, the court must be satisfied that, by the proposed change, the best interests of the child will be promoted. *Merges v. Merges,* 94 Or. 246, 186 P. 36; *Fisher v. Fisher,* 133 Or. 318, 289 P. 1062; *Leverich v. Leverich,* supra. On this point, although the evidence is conflicting, we are satisfied, as we think the trial judge was also, that the fitness of the mother as custodian and the fact that she carried out her duty in the premises excellently well are established by the weight of the evidence.

There was evidence on the part of defendant that the plaintiff objected to her son's attending social functions unaccompanied by her; that she accused him of becoming independent and sullen, "just like his father"; and that, on occasions, she threatened to poison herself and "end it all". Mrs. Hurner emphatically denies those charges. In the nature of things it would have been difficult, if not impossible, for her to support her denial by corroborative evidence, and yet we think there is indirect corroboration in the affidavits of credible residents of Pullman, indicating that, while there, plaintiff led a wholesome, normal existence. We think that the evidence shows that the plaintiff is a woman of education, character and resolution, who established and maintained a suitable home for her son, in a location and under conditions tending to promote his well-being. The exigencies of her situation, in view of the fact that the allowances for her own maintenance and for the support of the child were not adequate for those purposes unless supplemented from other sources, required that she should seek employment. It must be remembered also that the period during which the child was in her care coincided with World War II, and war conditions

imposed upon women generally the necessity, as a patriotic duty, of engaging in a certain amount of voluntary war work. With these matters in mind, we are of the opinion that she gave her son as good care as could have been given by any divorced person. In 1941 and 1942, the boy spent a part of the summer vacation months with his father in Portland. There are in evidence postcards written by the boy to his mother during those periods, couched in language which indicates clearly that he was homesick and anxious to return to his mother as soon as possible. Not until 1943, at a time shortly before he left Pullman to join his father, who had been transferred to San Mateo, did he show any dissatisfaction with conditions in and about his mother's home. He admitted that he was well satisfied with his mother's care in 1941 and 1942, but explained that, in those days, "I was under my mother's influence almost ten or eleven months of the year". He said that, since he did not see a great many things wrong with living in Pullman, he imagined it was as good a place as any. His mother, he said, was playing on his sympathies all the time. He considered that conditions at home were unbearable. His mother continuously tried to influence him against his father, criticizing, as immoral, the manner in which his father and his present wife were living. The thing, he said, which finally practically forced him to leave his mother was her saying, when she found out that his father had been ill, that it served him right, that he was living too wild a life, that she hoped he would stay ill, but that she didn't want him to die yet because she wanted some more money from him. Mrs. Hurner denied these charges, but they may have been true. Divorced persons are often very bitter toward

each other. The defendant himself, in a letter to his son which is in evidence, expressed his intention to "get rid of a certain parasite", referring, as he admitted, to "the person that was drawing my money away from me, my former wife".

The plaintiff attributes her son's sudden preference for his father and for life in his father's home at San Mateo to the vagaries of adolescence. This view is not without support in the evidence. In a letter to his mother, dated August 4, 1944, from San Mateo, the boy said in part:

" * * * I am not working nor do I intend to do so. I must have been awfully nervous from working there. I feel so relieved being here & not having to live by the clock. As you will recall I worked almost steadily for 3 yrs. in addition to my school work and music. No wonder I was so worn out as I had no time for relaxation. I am sure glad I am here as everything is wonderful and I would not give it up for anything because I love it. I have continual company & companionship so dont plan at all on my return."

An analysis of his testimony concerning his work suggests that his letter is an example of dramatic exaggeration. He did some lawn-cutting in 1941. In the summer of 1942, he delivered bulletins for the Washington Agricultural Extension Service, mowed lawns and worked at the College Commons all day. (By "all day", he explained, under interrogation, that he meant from eleven to two and from seven to eight.) Thereafter he worked in a furniture store from four in the afternoon until six in the evening, and on Saturdays from nine a. m. until noon and from one to six p. m. He admitted that almost all the boys and girls of his age (he was about twelve) in Pullman were working

at that time "in order to get money to spend". He quit working at the furniture store because he was not permitted to work the number of hours that he wanted to, and, on his own volition, went to work at the Washington Hotel in Pullman, where he was employed for about one month before leaving for California. He always kept his wages for himself. He testified: "Most of the money I put in war bonds, with the exception of things like getting haircuts and that type of thing, some of the minor trivialities that I had to have." He resented the fact that, on several occasions, because of his mother's absence while working, he had to prepare a simple meal for himself at home. He also resented his mother's "acting like she wanted to be the main attraction". He objected to her accompanying him to social functions, and stated that he "didn't want her flopping around". He is an intelligent lad. His English is good, and indicates that either the Pullman schools or his mother, or both, have grounded him thoroughly in that branch of education. When he went to California, "for business reasons" he changed his name from Frank Wilson Hurner to "Mr. F. Eric Hurner".

We are of the opinion that, having agreed that the boy should be given into the custody of his mother, it was incumbent upon the defendant to do nothing that would tend to undermine the relationship between mother and son. We think that he failed in that duty. His reference to the plaintiff as a "parasite" is significant. He obviously attempted to promote difficulties in the situation by suggesting to the boy, in a letter dated June 14, 1943, that he should invest the money which was being paid to the mother for the boy's support, or at least a large portion of it, in war bonds. In the same letter, incidentally, he shows

that he was aware of the fact that the boy was working, and that he approved of it, saying:

"* * * If you like your job there so well and don't want to leave it to come down for the summer I won't insist even tho I would like very much to have you visit me. You sure would like it here. Lots of excitement and traveling and so many things to see and do. Everything here is sure swell. California sure is a wonderful place."

His attitude toward plaintiff and his ideas respecting her status and the scope of her responsibilities as custodian of the child are expressed in the following quotation from his testimony:

"She was being paid and supported. I paid her to look after my boy. I gave her a home completely furnished and paid her enough for expenses. I don't know why she wouldn't look after him."

Our impression is that the boy was impatient of discipline. The small jobs of work that he was allowed or was encouraged to do were simply of the kind that most boys in his "station in life" are required, for their own good, to perform. If it were not for other factors, which we shall now consider, we should feel that any change in his custody would be contrary to his best interests.

The boy was born on October 30, 1929, and is now nearly seventeen years old. He was fifteen at the time of the hearing in the circuit court. At the hearing, he expressed emphatically his own preference that his custody should be awarded to his father. Under questioning by the trial judge as to what his plans were in the event that the court should refuse to make a change in custody, he said:

"The principal thought is, I won't live with my mother, and I will do almost anything to keep from doing so, because I don't want to."

 Defendant urges that, in determining the custody of a minor child past the age of discretion, the wishes and preferences of the child may be considered by the court. As to what is the age of discretion in this regard, the authorities hold that, if the child is sufficiently mature to have intelligent views and wishes on the subject, the court may consider them as persuasive, although not controlling. *Sheehy v. Sheehy,* 88 N. H. 223, 186 A. 1, 107 A. L. R. 635; *Johnston v. Johnston,* 155 Or. 256, 63 P. (2d) 209; 19 C. J., Divorce, section 810; 27 C. J. S., Divorce, section 309b; 39 Am. Jur., Parent and Child, section 21. These considerations influenced the trial judge in his decision that it was in the best interests of the child to award his custody to his father. The circumstances present a problem of some difficulty. It is virtually impossible to compel a fifteen-year-old boy, against his will, to remain in the custody of his mother, and, in fact, she herself does not desire that he should return to her unless he does so willingly. Moreover, the unavoidable lapse of time between the hearing in the lower court and our consideration of the case has brought the boy nearly to manhood, and this fact in itself makes it almost imperative that we should approve the lower court's disposition of the case in this particular. We, therefore, approve it.

The loving care of his mother has brought the boy safely through childhood. It is to be hoped that his father will guide him wisely through the difficult period of adolescence.

 The plaintiff suggests that, because of the fact that she has established and is maintaining a home for her son, and has thereby placed herself under financial commitments which will strain her resources, the defendant should be required to continue to pay her the

$45 monthly allowance for the support of the boy. For obvious reasons, this suggestion cannot be considered. Moreover, plaintiff's motion for an increase in her maintenance allowance was, in our opinion, properly denied.

The decree of the trial court will be modified by eliminating that portion which relieves the defendant from paying to plaintiff the sum of $70 a month for her support and maintenance. In all other respects, it is affirmed. Plaintiff may have her costs on appeal.