Argued February 17, affirmed April 1, 1953

# BEAMAN *v.* DeSHAZOR, JR.

255 P. 2d 157

*Lloyd V. Weiser* argued the cause for appellant. On the briefs were Weiser & Bowles, of Portland.

*Richard R. Morris,* of Portland, argued the cause and filed a brief for respondent.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN and PERRY, Justices.

WARNER, J.

This is a suit brought by the plaintiff Thelma E. Beaman against her former husband James C. De-Shazor, Jr., to set aside a property settlement agreement made by and between the parties and incorporated in and made a part of the decree in their divorce suit hereinafter referred to, and for an accounting with reference to the business known as Beaman Plastic Molded Products Company. From a decree determining that the parties were partners in the said business and directing that the same be dissolved and liquidated, plaintiff appeals.

Sometime in January, 1934, Joseph M. Beaman, the then husband of plaintiff, died, leaving her the sole owner of his entire estate, including a business pre-

viously operated by both of them and known as Beaman Molded Products Company. This name was later, and during the joint operation of plaintiff and defendant, changed to Beaman Plastic Molded Products Company. On June 24, 1945, plaintiff and defendant were married, but on April 28, 1951, on the complaint of plaintiff, were divorced in the circuit court of the state of Oregon for the county of Washington, and the former married name of the plaintiff was restored to her. The defendant entered no appearance in that case. Mrs. Beaman in her complaint in the divorce proceeding alleged that there were no property rights to be adjudicated by reason of a previously-executed property settlement agreement. This, at the time of trial, was tendered to the court and by the decree was approved, ratified and confirmed as "fair and equitable" and by reference in its entirety made a part of that decree.

It is this property settlement agreement which the plaintiff in this suit seeks to have set aside on the grounds that it is equitably unfair and was obtained through coercion and duress exercised by the defendant upon plaintiff.

It is conceded by both parties that the principal issue in this case is whether or not they are copartners doing business under the assumed name of Beaman Plastic Molded Products Company as contended by the defendant in his answer and so found by the lower court.

Plaintiff and defendant were not strangers at the time of their marriage in 1945 nor, indeed, at the time that the defendant entered actively into the business of making plastic molds in 1944. So far as we are able to determine, they became acquainted in 1940. At that time Mrs. Beaman was the owner of a small winery

business which she was attempting to operate at the same time she was carrying on the plastics business. This operation did not prove satisfactory; and having need for help, she retained the services of defendant who had had some collegiate training in the chemistry of wine products and experience in a business of that kind. Arrangements were soon made between them which resulted in his active management of that business on a partnership basis with plaintiff. This continued until 1942 when defendant entered the service of the merchant marine.

After leaving that service in 1944, DeShazor set up a bakery establishment in Portland, the trade of which was sustained, in the main, by customers employed in war production plants at that time. It appearing that success in this field might soon taper as the local war activities came to a conclusion, plaintiff persuaded defendant to close his bakery and assume an active and important place in the plastics plant. Prior to that time, defendant had, in off-hours, given plaintiff considerable assistance in adjusting certain new molding machinery which she had installed and was finding difficult to operate.

In October of that year, in response to plaintiff's solicitation, DeShazor closed his bakery and thereafter took an active hand in the management of the selling and producing end of what had theretofore been plaintiff's plastics company. He did so under the belief that he was a full partner and the owner of an undivided one-half interest. Mrs. Beaman, however, urges that he was not a partner but was to be compensated solely by receiving one half of the profits to be derived from that enterprise.

In 1944 the business was losing money. After that

year, and no doubt in large degree responsive to the activities of the defendant, the volume of the plastics business grew from a gross return in 1945 of $35,479.61 to returns in the later years as follows: in 1946, $69,-564.22; in 1947, $85,405.25; in 1948, $173,767.08; in 1949, $294,024.62; in 1950, $173,124.22; and in 1951, approximately $193,000. When DeShazor entered into the business, there were about 20 employees and in 1949 there were 40 employees.

The property settlement agreement referred to was executed by the parties on April 10, 1951, 18 days prior to the hearing and date of the divorce decree. It will not be necessary to spread this document in its entirety in this opinion. We shall, therefore, summarize it insofar as it relates to the business of the plastic molds company. It provides: "The parties are now equal partners doing business under the assumed name of BEAMAN PLASTIC PRODUCTS COMPANY. There shall be no change in such partnership with each party retaining an equal share in said business. * * *" It contemplates that the parties will continue to perform the same duties "in the partnership as [have] existed for the past several years." It proceeds to limit their respective powers with reference to purchases and requires the joint approval of the partners as to estimates for wares and merchandise sold. There is a provision for equal remuneration and the repayment of expenses incurred by the respective parties in the furtherance of the partnership business. A paragraph is addressed to what may ensue in the event that either of the partners marries some third party, and in that connection, speaks again of the one-half interest of such marrying partner in the partnership. The agreement contemplates the possibility that either partner

may receive a bona fide offer for such partner's interest and gives to the other partner an opportunity to purchase the interest sought by meeting any bona fide offer therefor. The possibility flowing from the desire of one partner to retire from the firm is given consideration, and agreement is made that "upon demand the retiring partner shall sell his interest in the partnership to the other party for one-half the book value of the partnership as ascertained at the last closing date of the partnership books prior thereto." We also deem it appropriate to note that the agreement carries the following provision: "This Agreement shall be effective if, as, and when an appropriate decree shall be rendered by a court of competent jurisdiction affirming, ratifying and approving this property settlement and dissolving the marriage relation now existing between the parties hereto."

It is apparent that if we find that the property settlement agreement, as approved by the court in the divorce case, was made in good faith and is invulnerable to the charge of plaintiff that it was the product of defendant's coercion and duress imposed upon her, then Mrs. Beaman is concluded thereby and her prayer for a cancellation of that document must be denied.

■ At the outset we observe that it is firmly established in this jurisdiction that if a property settlement made between a husband and wife is adopted and approved by a decree of divorce, it is beyond the power of the court to modify it subsequently. *Hurner v. Hurner,* 179 Or 349, 355, 170 P2d 720; *Briggs v. Briggs,* 178 Or 193, 197, 165 P 2d 772, 166 ALR 666; *Prime v. Prime,* 172 Or 34, 41, 139 P2d 550; *State ex rel. v. Kiessenbeck,* 167 Or 25, 36, 114 P2d 147; *Geis v. Gallus,* 130 Or 619, 626, 278 P 969.

The foregoing rule is, however, limited to contracts entered into in good faith and without the taint of fraud or evidence that undue advantage had been taken by either party in the making of a settlement in contemplation of a marital separation or divorce. *Taylor v. Taylor,* 154 Or 442, 445, 60 P2d 942; *Feves v. Feves,* infra.

More recently, in *Feves v. Feves,* decided March 18, 1953, Mr. Justice Tooze, speaking for the court, said:

"It is axiomatic that public policy requires that persons of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by courts of justice; and it is only when some other overpowering rule of public policy intervenes, rendering such agreements unfair or illegal, that they will not be enforced. Eldridge v. Johnson, 195 Or 379, 245 P2d 239, 251. This rule applies to persons who were formerly husband and wife, but who have been divorced, as it does to all other persons sui juris.

"* * * * *

"We have held that if an actual property settlement based on contract is entered into between a husband and wife and is approved by the court, it may be binding on the parties and beyond the power of the court to modify. * * * [Citations.]

"Approval by the court of such property settlement contracts made prior to or at the time of divorce, as the foundation of their binding effect, seems to be a requirement announced in our prior decisions. See generally Prime v. Prime, supra."

Before we explore the charges which the plaintiff now levels against the divorce settlement, it will not be amiss to take note of and give some weight to the educa-

tional, business and other background of Mrs. Beaman as of the time DeShazor took an active place in the plastics business, or indeed, as of the time of the execution of the property settlement agreement in 1951. This we will do by way of determining whether or not she is a person who might be expected to sense and fend herself against the machinations of another motivated by a design to enrich himself unfairly at her expense.

In 1944 plaintiff and defendant were, respectively, 46 and 31 years of age. Mrs. Beaman was a woman of more than ordinary academic background. She was educated in one of the nation's distinguished colleges for women. That was followed with training in bookkeeping and stenography in a Boston institution. Still later, she did work in engineering drafting, as taught in the Portland extension division of Oregon State College, and attained a considerable facility in being able to read blueprints and make cost estimates therefrom for the benefit of customers of the plastics company. For approximately two years prior to the death of her former husband, Joseph Beaman, in 1934, she had jointly and actively conducted the plastic molds business with him. Their enterprise was the beginning of the company now in controversy. This she continued alone for nearly ten years prior to marrying the defendant in 1945, during which time and thereafter she was an active participant in its daily operations. Mrs. Beaman was not only conversant with and supervised the fiscal affairs of the company and negotiated all loans necessary to be made during that time, including one from the RFC in the amount of $74,000, but she was thoroughly informed concerning the mechanical operations of the business to an extent qualifying her to take down and re-assemble certain items of its molding machinery.

The record reveals that in the course of her business, and particularly during the period of the strain in the marital relations between herself and husband antedating the divorce, she had had occasion to consult various lawyers, including the one who represented her in the divorce suit. Of the five different names mentioned, all are known to this court as able members of the Bar. At least four of these were consulted by her at different times prior to her signing of the agreement in controversy or during different phases of her negotiations with her husband and advised her relative to their prospective divorce and her property rights. Mr. Jarvis Black, who represented her in the divorce matter and drew the final draft of the settlement agreement, had previously been known to her as an attorney who had participated in certain deals relating to the acquisition or sale of some properties in which the company was interested. It is true that her husband suggested that she call upon Mr. Black for advice relating to the divorce and property settlement; but it is also apparent that when she evidenced some hesitancy about signing the property settlement, he urged her to secure independent counsel and that she thereupon took the agreement from him for that purpose and did not sign it until about a week thereafter. A review of these facts makes it difficult for us to believe that Mrs. Beaman was naive in the ways of the law or of trade or could be easily misled or trafficked upon to her loss or disadvantage.

There are more persuasive and more pertinent reasons, however, for concluding against the claims of plaintiff that she was the victim of any unfair advantage taken by her then husband, the defendant herein. When we lift the curtain on her charges of

coercion and duress, they disappear before the light of inquiry. She asserts that they are reflected by threats of the defendant that their business would be ruined by the publicity which would flow from the divorce suit. The implication is that if Mrs. Beaman would not execute the objectionable property settlement agreement confirming in her husband an equal partnership in the plastics business, he would contest the suit. The record discloses no grounds that De-Shazor might have or claimed to have in such a contest which would be adverse to her claim of right to a divorce; nor do we find therein any intimation of scandalous matter that might have been brought into the trial by him to his wife's shame or embarrassment.

The issue between the DeShazors during the months of negotiations preceding the divorce suit was not so much whether DeShazor was entitled to a share in the business but rather the extent thereof. No doubt, if he had entered the divorce suit for the purpose of protecting what he conceived, and we believe justly, was his one-half partnership interest in the plastics company, it would have resulted in exposing to the world the company's internal operations and its then not too satisfactory financial status, thus robbing customers of confidence and arming competitors with facts which they might employ to the disadvantage of the concern then owned by the parties. Although Mrs. Beaman testified that she signed the agreement because of her fear that the business would be ruined if she did not accede to defedant's urgent representations, it is interesting to note, in passing, that she has, by this present suit, made public the very business revelations which could work havoc on the future continuity and prosperity of the enterprise for which she then and now expresses such solicitude.

We find it difficult to convert expressions of a militant determination to protect a property right, made in good faith and supported by prognostications of the ultimate adverse results to all parties flowing from an active defense of that right, into proof of legal coercion or compulsion and, more particularly so, when addressed to a person of Mrs. Beaman's manifest intelligence and business acumen.

The defendant categorically denies making threats, if, indeed, what plaintiff claims are properly definable as "threats." In this he is corroborated by a Mrs. Evans, who, at the time of these negotiations for a property settlement, was intimately familiar with what was then transpiring between the parties. During this period of their domestic stress, she was not only a secretarial employee of the company but a confidante of Mrs. Beaman and a neutral friend of both parties.

The first rupture apparent in the DeShazor family appears sometime in 1949 and thereafter continued with increasingly strained relations between the parties until it culminated in the divorce in 1951. During the last year and a half of their married life, the parties at different times negotiated for an accord in their respective claims of interest in the plastic molds business. The record of their efforts in this respect constantly reflects the fraction of interest in the company now claimed by the defendant. We find that on December 12, 1949, both parties signed a draft of an instrument written on their own letterhead and apparently dictated by them at their own place of business. Its over-all character reflects the general pattern found in the divorce settlement. The opening paragraph of this document reads: "The Beaman Plastic Products Company being jointly *and equally* owned by Thelma

Beaman DeShazor and James C. DeShazor, Jr. * * *.''
(Italics ours.) Later, and on March 7, 1951, without
the aid of counsel, the parties jointly participated in
the dictation of a further agreement which they signed
on that date. Mrs. Evans, to whom we have made earlier
reference, took the stenographic notes on that occasion
and typed them into the form which the parties signed.
She testifies that each, in the course of that dictation,
contributed to the various matters that were incorpo-
rated therein. This agreement of that date was ap-
parently made as a preliminary step looking to an
early divorce. It contains, among other things, this
significant provision. ''The business owned by the
two parties doing business under the assumed business
name of 'Beaman Plastic Products Company', a co-
partnership shall remain a co-partnership; Each party
owning 50% in said business.''

After Mrs. Beaman retained the services of Mr.
Black as her attorney in the divorce suit, this latter
agreement became the basis for the final draft of the
property settlement which both parties signed about 35
days later and which was ultimately ratified and ap-
proved as a fair and equitable settlement by the judge
of the circuit court who presided at the divorce suit.

At times not made clear by the record but probably
close to the execution of the agreements of 1949 and
March, 1951, Mrs. Beaman was consulting with some
of the attorneys previously referred to concerning her
rights and defendant's rights in the premises. As a
medium for effecting a division of their respective
interests, Mrs. Beaman at various times during the
last year or so of the marriage relationship was giv-
ing serious attention to a possible conversion of the
business from a partnership into a corporation with

stock evidencing their respective ownerships. The testimony indicates that her greatest concern was lest it produce an unequal control between her and her then husband, with a resulting advantage to him. She at one time was apparently reconciled to a division of the stock on a basis which would give her 51 per cent and him 49 per cent and, at another, on a basis which would give her 49 per cent and her husband an equal amount with two shares reposing in some third party. Thus, control of the business appears to have been of even greater concern to her than was a denial of any ownership in her husband.

These items of evidence confirm in us the conclusion that Mrs. Beaman was not precipitated into signing the property settlement agreement against her free will but, on the other hand, deliberately did so with full knowledge of its consequences and an appreciation of the fairness of her husband's claim of ownership in the business referred to therein. We are also inclined to feel that this litigation springs not so much from Mrs. Beaman's belief that the defendant is not entitled to claim a one-half interest in the business but more from her reluctance to lose the dominating control.

When Mrs. Beaman appeared in the circuit court for the purpose of securing her divorce, she was in a favorable and friendly atmosphere for obtaining the relief she here seeks against her former husband, if, in fact, she then labored under the belief that she had been victimized by his compulsion into executing against her will a property settlement unfair and inequitable. All the matters and things she now claims in her effort to invalidate the divorce agreement were completely known to her at that time, but for no ap-

parent justifiable reason she voluntarily suppressed any reference to them and by her silence invited the court to give vitality to the settlement by its judicial approval. It then became her duty under the protection of the judge and her opportunity in the absence of the presence of her husband and, if necessary, with the aid of the deputy district attorney there representing the state, to disclose fully to the court the reasons which she now advances here as the basis for nullifying that agreement. Her failure, under the circumstances, to give voice to her misgivings and disclose defendant's alleged unconscionable conduct strongly suggests that what she now claims in that respect is the product of afterthought.

In support of her contention that the property settlement is unfair, the plaintiff points to *Hill v. Hill*, 124 Or 364, 264 P 447, where, at page 377, it is said that a property settlement agreement "is enforceable in equity only to the extent that it is just" and wherein this court made an order modifying the same. The Hill case is easily and clearly distinguishable on its facts from the instant matter. Moreover, we are of the opinion that the instant agreement lacks any qualities warranting an appeal to the chancellor for modification and should be held binding upon the parties except to the extent that it was modified by the lower court, and with their apparent concurrence, concerning items of property covered by the agreement which were not clearly capital assets of the partnership. *Taylor v. Taylor*, supra, 154 Or 445.

■ It is true that defendant made no direct contributions from his own resources to the partnership capital, and this prompts plaintiff to urge upon our attention the rule proclaimed by *Hunter v. Allen*, 174

Or 261, 147 P2d 213, 148 P2d 936, and by 68 CJS, Partnership, 904, § 391, to the effect that a partner contributing only services and no capital is ordinarily entitled to no share of the capital on dissolution. With this proposition we are in accord but, as indicated by the Hunter case, at page 267, and by 68 CJS, Partnership, 905, § 391, it is a rule which can be invoked only "in the absence of evidence showing a different intention of the parties". Also see 40 Am Jur, Partnerships, 373, § 348.

■ Here, however, plaintiff is confounded by the property contract. It renders the exception applicable. The agreement, as disclosed in the earlier part of this decision, is replete with provisions which indicate it contemplates a division of the capital assets in equal parts. We shall repeat only the heart of one of those covenants here by way of illustration, that is, the one relating to the retirement of either partner. There we find the following significant language employed: "* * * upon demand the retiring partner shall sell his interest in the partnership to the other party for one-half the book value of the partnership * * *." Whatever may have been the facts to the contrary prior to the negotiation of this agreement, the parties are now bound by the stipulations specifically recognizing an equal interest in the business and a like interest in its capital assets on its dissolution.

■ By this agreement the parties are not only concluded by their solemn declarations concerning the division of their respective interests in the capital of the partnership but also by those relating to its existence as of the date of the agreement and prior thereto. Under the circumstances, the plaintiff's extended discussion of rules to test partnership existence

and the abundant citations to authorities in support thereof become a matter of no concern to us on this appeal. However, in arriving at our conclusion, we have necessarily had to examine the evidence adduced by both parties in support of their respective positions and find that even if the property settlement agreement had not been entered into, we would be compelled to hold, on the basis of that showing, that a partnership of the degree of interest claimed by the defendant in this matter subsisted between the parties since October, 1944.

The decree of the lower court is affirmed, with costs to neither party.