Swigert & Howard, Appellants, v. Winfield Tilden,. Appellee.

Sale of Good Will: CONTRACTS IN RESTRAINT OF TRADE: PUBLIC POLICY. A contract between individuals, which is reasonable- and for a good consideration, will be enforced although it may appear in some respects in partial restraint of trade. So where one sold the good will of a mail order shirt business, with patterns, etc., and agreed that he would not engage in or lend his assistance to the manufacture of shirts at any place within one hundred miles of his place of business, or in selling shirts. in certain states for a period of ten years except as the agent of the other party, the same is not contrary to public policy,. as a matter of law, as being in restraint of trade.

*Appeal from Linn District Court.*—Hon. H. M. Remley, Judge.

Saturday, October 31, 1903.

This is an appeal based upon a ruling sustaining a de- murrer to the petition. The petition is in equity, and the allegations thereof are substantially as follows: That for many years prior to November, 1898, the defendant had been engaged in business in Des Moines as a maker of and dealer in shirts, collars, and cuffs, and had built up a large and profitable business; that he had advertised his business extensively, and from time to time received a large num- ber of orders through the mail from customers in the states of Iowa and Nebraska. It is said, however, that the business was carried on principally through salesmen traveling through Iowa and Nebraska, taking measure- ments of customers, and transmitting the same with orders to the factory at Des Moines, where the garments were made and forwarded in accordance with such orders;. that such orders and measurements had always been pre- served, and the measurements used in connection with

subsequent orders from the same customer; that the business had been so conducted that the good will thereof was of great value.   It is also alleged that, beginning some time prior to the date named, the defendant had engaged in the laundry business in said city of Des Moines; that he continued to conduct both the shirt and the laundry business down to October, 1898, when, having become insolvent, he abandoned his business, and filed in the district court of the United States a voluntary petition in bankruptcy.   It is said that his assets were wholly insufficient to pay his indebtedness, and that it became apparent that the only property which would remain to him would be the good will of each business so carried on by him.   The allegation follows that, to enable him to raise capital, and thus avail himself of the good will of the laundry business, defendant proposed to, and on November 5, 1898, did sell to these plaintiffs the good will of his shirt business for the sum of $500, the contract therefor being reduced to writing as follows: "This agreement witnesseth:  Winfield Tilden hereby sells and conveys to A. M. Swigert and W. G. Howard the good will of the shirt business heretofore conducted by him at Des Moines, Iowa.   They shall have the right to use his name in their business in such manner as may seem to their best advantage, but not to obtain credit or obligate Tilden for their debts.   He also sells and conveys to said parties all property pertaining to said business, set off or allowed him as exempt in the bankruptcy proceeding including all patterns, models and tools used in cutting shirts, a copy of diagrams of patterns held by him, one-half interest in patent for shirt bosom, cutting table, sewing machine, duplicate measurements, etc., etc.   For all of which he agrees to execute a bill of sale to said parties on demand, that he will instruct said Swigert and Howard in the trade of cutting shirts, collars and cuffs by above-named patterns and models, and devote a reasonable amount

of time each day thereto for sufficient time to enable them to use patterns intelligently, and thereafter answer all questions regarding cutting and measuring; that he will not engage, assist or lend his assistance in any way, in the cutting, manufacture or sale of shirts, collars or cuffs within one hundred miles of Des Moines, Iowa; nor engage or assist in the cutting, manufacturing or selling of made to order shirts in Iowa and Nebraska for ten years, except for above-named parties, it being recognized by the parties that the value of the good will hereby transferred consists almost wholly in mail-order business from Iowa and Nebraska points; that all mail addressed to said Tilden at Des Moines shall be delivered at the office or in the postoffice box of said Swigert and Howard. And said Tilden expressly agrees to hereafter turn over to said Swigert and Howard all orders and mail received by him pertaining to such shirt business. Swigert and Howard to pay said Tilden five hundred (500) dollars. That if said Tilden shall at any time hereafter wish to engage in the shirt business in any territory other than that above named, said Swigert and Howard are to allow him to take a copy of all patterns and models above conveyed; provided, that he is not to solicit business on territory that Swigert and Howard are at the time working."

Plaintiffs say that they were young men, each of the age of twenty-two years; the defendant being forty years of age. And they allege that they immediately commenced business, taking the business name of "Tilden Shirt Company," and are still so engaged; that they are not members of any combination seeking or attempting a monopoly, but entered into such arrangement solely to reap the benefits of the good will they had purchased. Further, that said good will covered the entire states of Iowa and Nebraska, and it was and is necessary to the full enjoyment thereof that defendant obligate himself for a reasonable length of time not to compete with them in

said territory; that defendant is familiar with the laundry business, and is thereby qualified to earn a living in said business, or in the shirt business outside the territory mentioned; that, following the making of said contract, the defendant was employed by plaintiffs for about six months, and thereby the value of the good will became enhanced, and defendant has as much influence with the customers of plaintiffs as he had at the contract date. It is then alleged that defendant is now employed by a firm of shirt makers at Kansas City, Mo., making and selling shirts on the same general plan as that of plaintiffs, and that defendant is traveling over the states of Iowa and Nebraska, soliciting his old customers, now customers of plaintiffs, and doing all in his power to take such customers from plaintiffs, and so deprive them of the benefits of the good will so purchased, and that defendant will so continue unless enjoined therefrom. It is said that the shirt business is in the nature of a profession, in which the taste and skill of the manufacturer is an important element; that customers who have received satisfactory garments usually go back to the same factory with future orders, owing to the confidence they impose in the makers. Plaintiffs say that they had been employed by defendant in his factory for several years prior to his failure, and understood his methods, plans, and patterns, and are able to make shirts identical with those made by defendant, but defendant is equally able to make the same, and, through his acquaintance and friendships, is able to divert from plaintiffs considerable of the business of old customers, which otherwise would come to the Des Moines factory; that there are other shirt factories engaged similarly in nearly all the cities of the United States, several of which send traveling men upon the said territory worked by plaintiffs. The defendant is alleged to be wholly insolvent. The prayer of the petition is that defendant be enjoined from selling or offering to sell, and

from aiding or assisting in the cutting, making, or selling of, shirts, cuffs, and collars, for himself or others within the states of Iowa and Nebraska, and for general equitable relief.

To the petition thus filed the defendant interposed a general equitable demurrer. The demurrer having been sustained, the plaintiffs elected to stand upon their petition, and refused to plead over. The petition was dismissed, there was judgment against plaintiffs for costs, and they appeal.—*Reversed.*

*Carr & Parker* and *Dunshee & Dorn* for appellants.

*Clark & Clark* for appellee.

BISHOP, C. J.—It will be observed that, by the contract in question, defendant agreed, without limitation of time, to abstain from engaging in the shirt business within a radius of one hundred miles of Des Moines; that, as related to the states of Iowa and Nebraska generally, the agreement provides for a time limit of ten years. Taking the facts as stated in the petition to be true—and, as far as well pleaded, the demurrer admits the truth thereof—it is manifest that the alleged conduct on the part of defendant does now, and, unless he be restrained therefrom, will continue to, interfere with, and work injury and damage to the property rights and business interests of plaintiffs. It is certain that the defendant possessed valuable rights, and, without dispute, these were in the nature and character of property rights. It was in consideration of a transfer of such to plaintiffs that they entered into the contract of purchase, and paid the consideration price. It would seem that common fairness requires that plaintiffs should be protected in the rights thus acquired by them, unless, forsooth, some consideration of general public policy dictates that their complaint should go unheard. That the attempted restriction is

against public policy, and therefore void, is the sole contention on behalf of appellee. It is said that the contract, having application to the entire states of Iowa and Nebraska, is one in general restraint of trade; that the one hundred mile restriction is a limitation in pretense only, while covering practically the entire state; and that the same cannot be upheld, because the contract being indivisible, if one part is void all parts are void.

The doctrine that contracts in general restraint of trade are to be held void as against public policy found root early in the development of our system of law, and recognition of such doctrine has continued down to the present time, but with more or less of modification as different courts have been called upon to make practical application thereof. Formerly, in the enforcement of this doctrine, the rights of the immediate parties to a contract, as between themselves, were put entirely out of view until it had been determined that the contract was not one, the enforcement of which would operate as an encroachment upon the interests of the general public. The reason of the rule is said to be two-fold—that such restraints work injury to the public by depriving it of the industry of the restricted party in the vocation for which he is best adapted, as well as by the tendency thereof to throw the person so restrained upon the public for support, or compel him to expatriate himself and transfer his residence and allegiance to some other state or country in order to pursue his occupation; also that the tendency of such restraint is to foster monopolies, prevent competition, enhance prices, and might ultimately enable organized capital to silence all competition, become the sole producer, and place the public at its mercy. The following cases will serve to illustrate: *Alger v. Thatcher*, 19 Pick. 51 (31 Am. Dec. 119); *Wright v. Ryder*, 36 Cal. 342 (95 Am. Dec. 186); *Western W. Ass'n v. Starkey*, 84 Mich. 76 (47 N. W. Rep. 604, 11 L. R. A. 503, 22 Am. St. Rep. 686);

1 Smith's Leading Cases (9th Ed.) 694. In view, however, of the ever-changing conditions of trade, commerce, the mechanic arts, etc., and the diversity of interests which obtain in the various states and countries, it must be manifest that there can be no single standard respecting public policy. This is true to the extent that it frequently happens that in certain respects the policy of one state is found to be the exact opposite of that maintained by another; and, even where there is no essential difference in the matter of abstract definition, it may be certain that self-interest, viewed from the standpoint of locality more or less immediate, will enter into and dominate the side of practical application. Now, in this country we have no such conditions as existed when the doctrine was first promulgated. In a recent case it has been well said: "Public policy is a variable test. In the days of the early English cases, one who could not work at his trade could hardly work at all. The avenues to occupation were not as open nor as numerous as now, and one rarely got out of the path he started in. Contracting not to follow one's trade was about the same as contracting to be idle, or to go abroad for employment. But this is not so now. It is an everday occurrence to see men busy and prosperous in other pursuits than those to which they were trained in youth, as well as to see them change places and occupations without depriving themselves of the means of livelihood, or the state of the benefit of their industry. It would therefore be absurd, in the light of this common experience, now to say that a man shuts himself up to idleness or to expatriation, and thus injures the public, when he agrees, for a sufficient consideration, not to follow some one calling within the limits of some particular state. There is no expatriation in moving from one state to another, and from such removals a state would be likely to gain as much as it would lose." *Herreshoff v. Boutineau,* (R. I.) 19 Atl. Rep. 712

(8 L. R. A. 469, 33 Am. St. Rep. 850).   Again, in *Wood*
*v. Whitehead*, 165 N. Y. 545 (59 N. E. Rep. 357) it is said:
"The doctrine which avoids a contract for being one in
restraint of trade is founded upon a public policy.   It
had its origin at a time when the field of human enterprise
was limited, and when each man's industrial activity was
more or less necessary to the material well-being and wel-
fare of his community and of the state.   The conditions
which made so rigid a doctrine reasonable no longer exist.
In the present practically unlimited field of human enter-
prise there is no good reason for restricting the freedom to
contract, or for fearing injury to the public from contracts
which prevent a person from carrying on a particular bus-
iness.   Interference would only be justifiable when it was
demonstrable that in some way the public interests were
endangered."   See, also,   *Diamond Match Co. v. Roeber*,
106 N. Y. 473 (13 N. E. Rep. 419, 60 Am. St. Rep. 464);
*Leslie v. Lorillard*, 110 N. Y. 519 (18 N. E. Rep. 363, 1 L.
R. A. 456).   To any one at all familiar with present-day
conditions, it requires no argument to demonstrate that
public policy requires that in trade matters there shall be
no restraints imposed, save in those instances where it is
clearly made to appear that the public welfare would be
otherwise seriously endangered.   And an all-important fac-
tor in business life is the right of individual contract—the
right to buy and sell, to bargain and convey at will.   The
demand for recognition of this, coming up from the world
of business, has been heard, and countenance given
thereto, by legislatures and courts everywhere.   So, too,
note has been taken of the baneful results which follow,
seemingly with inevitable certainty, from giving sanction
even negatively, to acts or conduct involving fraud or
dominated by bad faith.   Certainly it is not going too far
to say that there can be no sound public policy which
operates to give countenance to the open disregard and

violation of personal contracts entered into in good faith
and upon good consideration.  A recent expression of the
English Court of Appeals on the subject rings true.  In
*Underwood v. Barber*, 68 L. J. Ch. Div. 201, it is said:
"If there is one thing more than another which is essential
to the trade and commerce of this country, it is the in-
violabilty of contracts deliberately entered into; and to
allow a person of mature age, and not imposed upon, to
enter into a contract, to obtain the benefit of it, and then
to repudiate it and the obligations which he has under-
taken, is *prima facie* at all events, contrary to the inter-
ests of any and every country."

It has thus come to be the rule of the cases in most
jurisdictions that a contract in itself reasonable and based
upon good consideration will be enforced according to the
rights of the respective parties thereto, and this notwith-
standing it may appear that in some respects or in a lim-
ited way the enforcement of such contract has for a result
a partial restraint of trade.  Several of our own cases make
it certain that such is the rule in this state.  *Heichew v.
Hamilton*, 3 G. Greene, 596; *Hedge v. Lowe*, 47 Iowa, 137;
*Smalley v. Greene*, 52 Iowa, 241; *Chapin v. Brown*, 83
Iowa, 160.  See, also, the following recent cases from
other jurisdictions in which the doctrine has found appli-
cation:  *Diamond Match Co. v. Rueber, supra*; *Herreshoff
v. Boutineau, supra*; *Cowan v. Fairbrother*, 118 N. C. 406
(24 S. E. Rep. 212, 32 L. R. A. 829, 54 Am. St. Rep. 733);
*Wood v. Whitehead Bros. Co.*, 165 N. Y. 545 (59 N. E.
Rep. 357); *Anchor Electric Co. v. Hawkes*, 171 Mass. 101
(50 N. E. Rep. 509, 41 L. R. A. 189, 68 Am. St. Rep. 403);
*Trenton Potteries Co. v. Olyphant*, 58 N. J. Err. & App.
507 (43 Atl. Rep. 723, 46 L. R. A 255, 78 Am. St. Rep.
612).  It is to be noted, however, that a distinction is gen-
erally drawn, and with much force, between those trades
or avocations, on the one hand, in which the general pub-
lic, as such, has some special interest, as, for instance,

common carriers, water and light companies, and others of a *quasi* public character, and those trades and avocations, on the other hand, in which the interest does not arise out of a common necessity, or is not otherwise a matter of common concern to the general public, but which serve rather to minister to the convenience or gratify the de-sires, tastes, etc., of such individual members of the com-munity as care to extend their patronage. The reason for this is apparent. Take the case of a city in which water is supplied to the inhabitants from two or more general sources, each under the control of a separate private ownership. Now, a contract between such owners, what-ever the consideration as between themselves, providing for the shutting off of all such sources of supply but one, would serve to create a monopoly, and would certainly be so far repugnant to the general public interest that the courts would refuse to enforce the same. The case of *Chapin v. Brown, supra,* furnishes a further illustration. It there appeared that all dealers doing business in Storm Lake who had theretofore engaged in the purchase of but-ter from the farmers of the surrounding country entered into a contract with plaintiff to the effect that they would discontinue such business, and give plaintiff sole and ex-clusive control thereof. Here was an interest common to all the farmers residing within the trade circle of Storm Lake, and the court held that the contract was void as against public policy, for the reason that the direct tend-ency and effect thereof was to create a monopoly. But to our minds the reasoning which proves satisfactory in such cases loses quite all its force when applied to a case where, as for illustration, two out of one hundred or one thousand shirt dealers agree between themselves, upon a sufficient consideration, and without any purpose to control the trade generally, that the one will not engage in business in competition with the other. And this more especially where one sells out his business, including the good will

thereof, to the other. In such cases the interest of the general public, from a trade standpoint, is infinitesimal. We have simply the substitution of one tradesman for another.

In giving application to the present-day doctrine, it has been said that the true test is whether the restraint is such only as to afford a fair protection to the interests of the party in favor of whom it is given, and not so large as to interfere with the interests of the public. And the restriction must be reasonable, not oppressive, or out of proportion to the benefits which the vendee may, in reason, expect to flow from the restrictive features of the contract. In *Hubbard v. Miller*, 27 Mich. 15 (15 Am. Rep. 153), it is said: "If, considered with reference to the situation, business, and objects of the parties, and in the light of all the surrounding circumstances with reference to which the contract was made, the restraint contracted for appears to have been for a just and honest purpose, for the protection of the legitimate interests of the party in whose favor it is imposed, reasonable as between them and not specially injurious to the public, the restraint will be held valid." And this language is quoted approvingly in *Hedge v. Lowe, supra.* Now whether a contract is reasonable in respect of the length of time during which the restriction is to run, and in respect of the scope of territory which is to be covered thereby, as applied to a case like the one before us, it would seem that the fair and full protection of the business and good will which the vendee has purchased and paid for may well be accepted as the test. Certainly the restriction ought not to be wider in the scope of its operation, and there can be no good reason for confining it to any narrower limits. It follows naturally that each case must be governed in the main by its own facts. Take, for instance, the case of *Hedge v. Lowe.* There it appeared that Lowe had sold his stock of goods at Winterset to Hedge, and, in connection

therewith, had agreed that he would not engage in the same business at Winterset or vicinity for a period of five years.   There was no suggestion that the restriction as to time or territory was unreasonable, and such could not have been well urged, in view of the fact that the business was carried on at retail, and, of necessity, confined to the town where located and its vicinity; and five years was not thought an unreasonable time in which to enable the purchaser to convert the good will of the vendor into a good will personal to himself.   But manifestly there are trades and employments which, from their nature, cannot be and are not confined to local limits.   The business of a wholesale merchant in the city of Des Moines will serve to illustrate.   His trade extends over the state as a whole, and mayhap into adjoining states.   It certainly cannot be said that the good will of his business is limited to the city of Des Moines.   On the contrary, it must be apparent that it extends as far as his trade extends.   Now, there is no basis upon which to draw a distinction between the enforcement of the property right in the good will of a retail business at Winterset and the enforcement of the property right in the good will of a wholesale business at Des Moines, as the same actually exists.   Nor are we persuaded that the welfare of the state is jeopardized in the one case more than in the other.   The expatriation of the one is no different in character from that of the other and the one is no more likely to become an idler or pauper than the other.   Indeed, as we read the cases, the courts no longer attempt to fix geographical limits within which only contracts of the character in question can be enforced.   And if such they ever had, the terms "general restraint of trade" and "partial restraint of trade" have no longer a territorial meaning.   We think the subject may be disposed of by saying that in respect of time and territory, and in the absence of any affirmative showing that the public welfare is put in jeopardy, as that a mon-

opoly is created, or the like, the validity of all such con-
tracts must be made to depend upon the question, as
presented by each case, whether the restraint goes so far
only as to reasonably insure to the purchaser the full en-
joyment of the right purchased by him in good faith and
for a good and valuable consideration.   This view finds
support in many of the reported cases.   Among others,
the following may be referred to:   *Cowan v. Fairbrother*,
118 N. O. 406 (24 S. E. Rep. 212, 32 L. R. A. 829, 54 Am.
St. Rep. 733); *Oregon Navigation Co. v. Winsor*, 20 Wall.
64 (22 L. Ed. 315); *Nordenfeldt v. Maxim*, 63 L. J. Ch.
Div. 908; *Smalley v. Greene*, 52 Iowa, 241; *Troendle v.
Bender*, (Iowa) 79 N. W. Rep. 1123.   We are aware that
there are cases in which a contrary doctrine is announced.
We have examined all those cited by counsel for appellee,
and others as well, and we find nothing to disturb the
conclusion as above expressed.

It follows from what we have said that, as matter of
law, at least, the contract involved in this action cannot
be held to be void as in general restraint of trade.   The
good will sold extended over the territory covered by the
contract, and, in the absence of any showing, the time
limit, as applied to the states of Iowa and Nebraska, can-
not be said to be unreasonable.   Even though the time
limit, as applied to the city of Des Moines and vicinity,
may be said to be unreasonable, we cannot agree that this
avoids the contract in its entirety; and, as the petition
states a cause of action, the demurrer should have been
overruled. —REVERSED.