Argued May 6, reversed and remanded with directions May 28, petition for rehearing denied June 25, 1952

# ELDRIDGE ET AL. *v.* JOHNSTON

245 P. 2d 239

*S. H. Burleigh* argued the cause for appellants. On the brief were Dixon & Burleigh, and R. D. H. Swindley, all of La Grande.

*Charles R. Cater,* of La Grande, argued the cause and filed a brief for respondent.

Before BRAND, Chief Justice, and HAY, LATOURETTE, WARNER and TOOZE, Justices.

TOOZE, J.

This is a suit for injunction, brought by D. W. Eldridge, individually, and D. W. Eldridge, Hazle B. Eldridge, John L. Eldridge, and D. W. Eldridge, Jr., partners, dba Eldridge Packing Company, as plaintiffs, against Harold Johnston, as defendant, to restrain defendant from carrying on a meat business in the counties of Union, Umatilla, Baker, and Wallowa, Oregon, in competition with plaintiffs, in violation of contract. The trial court entered a decree in favor of defendant; plaintiffs appeal.

Plaintiffs are engaged in the meat-packing business, with their principal place of business located in La Grande, in Union county, Oregon. Their operations extend into several parts of the state of Oregon, and, in particular, into the counties of Union, Umatilla, Baker, and Wallowa. They buy livestock, slaughter the same and process the meat, and sell the processed meat to customers. Defendant owns a small farm near Hermiston, in Umatilla county, and operates a slaughterhouse thereon. He buys livestock, slaughters the same, and sells meat in Umatilla county in competition with plaintiffs.

Prior to and on November 15, 1941, the Grande Ronde Meat Company, a corporation, owned and operated a meat-packing plant in La Grande, consisting of land, packing plant, barns, feed sheds, yards, and other outbuildings suitable to the meat-packing business, fixtures and equipment, and a stock of goods and merchandise. One F. A. Epling was the principal stockholder in and the manager of said corporation. For

three years continuously immediately prior to November 15, 1941, defendant had been employed as the traveling salesman for the corporation. Prior to that time and beginning about the year 1929, defendant had been employed in the meat business in the state of Florida. He was thoroughly experienced as a salesman of meat products, and was in close contact with the trade built up by the Grande Ronde Meat Company. During the latter months of his employment with that corporation, defendant was paid $150 per month as compensation for his services. Also, during a part of 1941, plaintiff D. W. Eldridge was temporarily employed by the corporation, and became associated with defendant in the work of that organization.

In the fall of 1941, plaintiff D. W. Eldridge entered into negotiations with Epling for the purchase of the entire business of the Grande Ronde Meat Company, including the lands, buildings, equipment, and stock of goods and merchandise. While these negotiations were in progress, said plaintiff frequently conferred with defendant in regard thereto, and proposed to defendant that he remain connected with the business in the event of its purchase by plaintiff. As to this, defendant, as a witness on his own behalf, testified on direct examination as follows:

"Q Who purchased the plant that is now known as the Eldridge Packing Company from the Grande Ronde Meat Company?

"A D. W. Eldridge, Sr.

"Q And you had nothing to do with that purchase?

"A No, sir.

"Q Had D. W. talked to your prior to his purchase of the thing?

"A Yes, he had.

"Q Will you tell the Court what was said?

"A Well, Mr. Eldridge had talked to me. The deal was in progress between he and Epling—and whether I would want to stay or not, and what kind of a deal we could work out for us if he completed his deal with Mr. Epling.

"Q Was anything said at that time about a partnership?

"A Yes, sir, there was.

"Q Will you tell the Court what was said?

"A Well, he told me that he would form a partnership, which would be some sort of working agreement so that I could at some time own an interest in the plant. At least it was called a partnership all the time.

"Q He led you to believe that you would be a partner in the plant?

"A Yes, sir.

"Q And what was the money arrangement? Were you to be paid, or what was to be the situation?

"A I was supposed to draw so much per week, which I believe at that time was $50.00, and that was a very low wage at that time, and I was—I was supposed to pay him five dollars a week on my stock, and then the net profit from the company was supposed to pay for the balance of my stock.

"Q Was a partnership agreement ever entered into?

"A Well, just what we have here. That was the only agreement we ever had."

On November 15, 1941, the Grande Ronde Meat Company, as seller, and plaintiff D. W. Eldridge, as purchaser, entered into a conditional sales contract of sale and purchase, whereby the seller sold to the purchaser the entire business of the seller, including lands, buildings, equipment, etc., for the sum of

$45,000, plus the inventoried value of the stock of goods and merchandise then on hand. The contract provided for the payment of the purchase price in monthly installments according to a schedule therein set forth. Title to all the property remained in the seller until the purchase price was paid in full. Immediate possession, however, was delivered to the purchaser, and thereafter the purchaser and his associates conducted the business. Defendant was employed as head salesman at the agreed salary of $50 per week.

On November 15, 1941, plaintiff and defendant entered into an agreement whereby defendant agreed to purchase an interest in said business. Defendant was wholly without funds with which to pay for such interest, and it was agreed that he might pay therefor out of the profits, plus weekly cash payments of $5. This agreement was reduced to writing and executed between plaintiff D. W. Eldridge and defendant in February, 1942, and is as follows:

"THIS CONTRACT made and entered as of date November 15, 1941 by and between D. W. Eldridge, as party of the first part, and Harold Johnston, as party of the second party [sic], WITNESSETH:

"THAT WHEREAS D. W. ELDRIDGE as of date November 15, 1941, purchased from the Grande Ronde Meat Company the packing plant, equipment and inventory of the packing plant of the said company at La Grande, Oregon, under a contract of purchase, and is now operating the said plant under the name of Eldridge Packing.

"AND IT FURTHER APPEARING that the parties hereto desire to enter into a contract whereby the second party is to receive a working interest in said business.

"NOW THEREFORE, in consideration of the mutual covenants one to the other, it is hereby

contracted and agreed between the parties as follows, to-wit:

"That said business shall be capitalized on the basis of $51,500.00, and that the party of the first part hereby agrees to sell unto the second party an interest therein on the basis of $5,000.00 of said capitalization, same to be sold, paid for and delivered as follows, to-wit:

"The said second party shall pay to the first party the sum of $5.00 per week, cash to be applied on said capital interest, and in addition thereto, there shall be applied thereon the proportionate earned net dividends from said business that would be apportioned to said interest, same to be applied on a monthly basis, said cash payments and said monthly application of earned net dividends to be applied from time to time and as herein provided, until said sum of $5,000.00 shall have been paid in full, without interest.

"IT BEING FURTHER PROVIDED that in the event the second party resigns as an employee of the organization and prior to the time that said interest shall have been paid for in full, or should die, that then and in that event the said second party, or his executors or administrators, shall have repaid to him, or them, without interest the cash that he has paid on said interest after such resignation. However, it is specifically provided that he is not to receive any payment whatsoever for any earned dividends from the business that may have been applied on said purchase price.

"IT BEING FURTHER PROVIDED that in the event the contract with the Grande Ronde Meat Company for the purchase of said property is forfeited and becomes null and void, that all rights of said second party under this contract shall cease at the same time, and there shall be no obligations on the part of the first party hereunder.

"IT IS FURTHER PROVIDED that the party of the first part shall act as the general

manager in the conduction of the business of said packing plant, and shall have full charge of the operation of the business.

"IT IS FURTHER PROVIDED that the interest of the second party as created hereby cannot be assigned by the second party prior to its full payment, without the written consent of the party of the first part, as this contract is personal with the party of the second part and runs to him only.

"IN WITNESS WHEREOF the parties hereto have hereunto set their hands and seals to this and another instrument of the same tenor and date.

"Dated at La Grande, Oregon, this................... day of February, 1942.

"[Sgd.] D. W. Eldridge (SEAL)
Party of the First Part

[Sgd.] Harold Johnston (SEAL)
Party of the Second Part."

On January 31, 1942, there was duly recorded in the official records of Union county a certificate of assumed business name, in words and figures as follows:

"Notice is hereby given, that the undersigned, D. W. Eldridge, John Eldridge and Harold Johnston, will conduct the business of, and are the sole owners of the business known as Eldridge Packing Company, in the City of La Grande, Union County, Oregon, and so conducted under the name of Eldridge Packing Company, and the true and real names of the owners of the said business are D. W. Eldridge, John Eldridge and Harold Johnston. The said D. W. Eldridge, John Eldridge and Harold Johnston are the sole owners thereof and the only persons having any interest whatsoever in the said business and the Post Office Address of the said Eldridge Packing Co. is La Grande, Oregon, P. O. Box 874; and the said undersigned D. W. Eldridge, John Eldridge and Harold Johnston do hereby set

forth that they are the sole owners of the said business.

 "[Sgd.] D. W. Eldridge
 [Sgd.] John S. Eldridge
 [Sgd.] Harold Johnston

"State of Oregon :
 : ss.
County of Union:

"This certifies that on the twenty-first day of January, 1942, before me, the undersigned, a Notary Public in and for the County of Union, State of Oregon, personally appeared the within named D. W. Eldridge, John Eldridge and Harold Johnston, personally known to me to be the identical persons described in and who executed the within and foregoing certificate of Assumed Business Name, and they acknowledged to me that they executed the same freely and voluntarily and for the uses and purposes therein named.

"In Testimony Whereof, I have hereunto set my hand and notarial seal the day and year last above written.

 "[Sgd.] H. E. Dixon

[Notarial seal.]

 Notary Public for Oregon
 My commission expires
 September 18th, 1943."

Defendant continued to render services as a salesman for the Eldridge Packing Company until on or about December 1, 1944, receiving a weekly salary of $50. From this salary the usual pay-roll deductions were made, the same as are made from the salary or wages of all employes. In addition to this salary, defendant was credited upon the books of the partnership with his share of the net profits of the business, the same being applied in liquidation of the purchase price

of his interest in the business pursuant to the provisions of the contract set forth above. Defendant also continued to make the payments of $5 cash each week, pursuant to the contract until March 1, 1944, when, by written memorandum executed by himself and plaintiff D. W. Eldridge, that portion of the original agreement was abrogated.

For the year 1942, Eldridge Packing Company filed its partnership income tax return with the Collector of Internal Revenue, listing the names of the partners, and the several amounts of their respective interests in the net income of the firm for the calendar year of 1942. Relating to these matters, the return shows the following:

"D. W. Eldridge, La Grande, Oregon $8274.16
Harold Johnston, '' '' '' 2894.27
John Eldridge '' '' '' 2894.27"

For the calendar year of 1942, defendant also filed his individual income tax return with the Collector of Internal Revenue, in which he set forth the sum of $2,894.27 as the net profit he received during that year from the business.

The partnership federal income tax return of Eldridge Packing Company for the calendar year of 1943 also listed the names of the partners and the several amounts of their respective interests in the net income of the firm for that year, as follows:

"D. W. Eldridge, La Grande, Oregon $12887.76
John S. Eldridge, La Grande, Oregon 1610.97
Harold Johnston, La Grande, Oregon 1610.97"

For the calendar year of 1943, defendant also filed his individual income tax return, in which he set forth the salary he had received in the sum of $2,220 and his share of the net profits of the business in the sum

of $1,610.97, showing a total personal income of $3,830.97.

There is in evidence an automobile liability policy dated May 29, 1942, and covering the use of a Dodge 1 1/2-ton truck, in which the "insured" is named as follows: "D. W. & John S. Eldridge & Harold Johnston dba Eldridge Packing Co."

Commencing in 1942 and continuing until defendant's separation from the business as hereafter discussed, defendant was carried upon all the books and records of Eldridge Packing Company as a partner. This was in keeping with the original agreement between the parties. As an adverse witness called by plaintiffs, defendant on direct examination testified:

"Q And after he had made the purchase did you and Mr. Eldridge enter into an agreement whereby you would continue to work in the business and also become the purchaser of an interest therein?

"A Yes, sir.

"Q And the copy of the agreement which you entered into at that time is the same as the copy of the agreement which is attached to your answer in this case?

"A Yes, sir.

"Q Now following that,—your agreement was oral, I believe, to start with, wasn't it?

"A Yes, sir. We talked it over several times.

"Q And while you worked there from, I believe, November '41, at the time Eldridge actually purchased the place, the written agreement wasn't entered into until sometime in February?

"A Yes, sir, that is right, it was dated February.

"Q But that was the agreement you started out with?

"A It was supposed to be a partnership

agreement. I never knew what it was. It was supposed to be drawn up and be safe for everybody, and later they came up with that.

"Q What the agreement was,—you become partners and you purchased part of the business?
"A Yes.

"Q And when the agreement was drawn it was the one attached to your—
"A (Interrupting) Yes, sir.

"Q And you executed that agreement?
"A Yes, sir."

Upon the trial, defendant sought to dispute the claim that he was a partner, though during his association with the firm he made no such contention. As one of the grounds for the present claim that he was not a partner, defendant pointed out that plaintiff Eldridge personally borrowed all the monies necessary to be borrowed by the company and otherwise conducted all the financial operations of the business. However, it will be noted that, under the specific provisions of the original contract between Eldridge and defendant, Eldridge was to "act as the general manager in the conduction of the business of said packing plant, and shall have full charge of the operation of the business." The lending bank relied upon the personal financial responsibility of Eldridge alone in making loans of money for use in the business. Defendant, in support of his contention, also pointed out that there was no agreement between the parties that he, the defendant, should suffer any of the losses that might occur from the operation of the business. The record does not disclose that the question of "losses", as distinguished from "profits", was ever discussed between the parties. However, as a practical matter, had the business suffered losses instead of making

profits, Eldridge would perhaps have been the principal loser, as he apparently was the only one of the partners possessing financial responsibility, and also the only one who had his own money and credit actually invested in the business, but that in no way alters the legal responsibility of the other partners, including defendant.

■ Respecting the question of "losses", the rule is stated in *Meads v. Stott,* 193 Or 509, 238 P2d 256, 267, as follows:

"The clear preponderance of the evidence in this case shows that plaintiff agreed to and did combine his labor, skill, and experience with the property and financial assistance of defendant to carry on the business of United as a partnership. True, plaintiff paid no money to defendant directly for the one-half interest in the property of the firm, but under their agreement he was not required to. This was to be paid out of the profits of the venture. Though nothing was said in the agreement about sharing the losses, nevertheless, that is implied. As was stated by this court in Lee v. Ellis, 121 Or 259, 267, 253 P 873, 876: 'It is now settled beyond a doubt that there need not be any specific agreement to share losses as well as profits, the other elements being present, in order to constitute a partnership. Where parties engage in a common undertaking or business, with the understanding that they are to divide the profits, it follows naturally, in the absence of any specific understanding to the contrary, that they must share the losses.' "

■ It is well established by the authorities that the existence of a partnership inter se depends on the intention of the parties. *Meads v. Stott,* supra; *Claude v. Claude,* 191 Or 308, 323, 228 P2d 776, 230 P2d 211. *Preston v. State Ind. Acc. Com.,* 174 Or 553, 149 P2d 957.

■ In *Claude v. Claude*, supra, at page 323, Mr. Justice WARNER, speaking for the court, said:

"* * * Not only does the intent of the parties govern but such intent will be determined from the effect of the whole contract, regardless of special expressions. * * *"

■ It also is well settled that, where the parties to a contract, by their acts, conduct, or agreement show that they intended to combine their property, labor, skill, and experience, or some of these elements on one side and some on the other, to carry on, as principals or coowners, a common business, trade, or venture as a commercial enterprise, and to share, either expressly or by implication, the profits and the losses or expenses that may be incurred, such parties are partners. *Meads v. Stott*, supra; 68 CJS, Partnership, 433 § 20a (1).

Section 79-202, OCLA, a portion of the Uniform Partnership Law, in part provides:

"* * * * * *

"(4) The receipt by a person of a share of the profits of business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment:

"(a) As a debt by instalment or otherwise;
(b) As wages of an employe or rent to a landlord;

* * * * *

(e) As the consideration for the sale of the good will of a business or other property by instalments or otherwise."

■ The record in this case discloses that defendant received a share of the profits of the business. It is immaterial that he did not receive the same in cash. The application of his share of the profits toward the payment for his interest in the business had the same

effect. Under the written agreement between Eldridge and defendant, defendant purchased a one-tenth interest in the business for the agreed consideration of $5,000, the same to be paid largely from the profits of the business. His portion of the profits were in no way paid or credited to him as wages, nor did they have anything whatever to do with the services he rendered the company. For those services he was regularly paid a stipulated salary.

Under all the facts and circumstances of this case and the law applicable thereto, we find that defendant was a partner in the Eldridge Packing Company. As such partner, he owned an interest in the good will of the business of that firm. Furthermore, and wholly apart from the question of partnership, defendant clearly owned an interest in the business, including its good will.

During the forepart of defendant's employment as salesman for the Eldridge Packing Company, that company transacted business as far away from La Grande as Hood River, in Hood River county. During the latter part of his employment, the company was doing business chiefly with Safeway stores, and its sales reached into Portland, and to points along the Oregon coast.

■ On or about December 1, 1944, defendant expressed a desire to sell his interest in the Eldridge Packing Company and to retire from his employment, so that he might return to Florida. At that time the company had approximately $8,000 in cash on hand, defendant's interest therein being $800. In addition thereto, defendant's interest in the business then had a book value of approximately $7,500. The original purchase price for the business had theretofore been completely paid by Eldridge and his wife, the parties using

in part payment thereof funds derived from the sale of community property in Idaho. Because of the use of these funds, it was determined that Hazle Eldridge, the wife, had a proportionate interest in the business with her husband, and thereafter she was listed as one of the partners.

Defendant finally was offered, and he accepted, the sum of $2,500 in cash for his interest in the business. In his answer filed in this case, defendant alleges that he was wrongfully coerced by plaintiff D. W. Eldridge into accepting said sum of $2,500, when, in fact, his interest was worth much more. The record disputes this contention. As an adverse witness called by plaintiffs, Johnston, on direct examination, testified:

"Q And when did you cease working for the company?

"A December 1st, 1944.

"Q Now at that time did you make an agreement with Eldridge, whereby he would pay you a certain amount of money and you would withdraw from the business?

"A I told him I wanted to withdraw; in fact I had to; it wasn't a question of what I wanted to do. I had to.

"Q You did say you wanted to withdraw?

"A Yes, sir.

"Q Now at that time did you attempt to sell your interest in the business?

"A Yes, sir.

"Q And who did you attempt to sell to?

"A There wasn't no one interested in it only Mr. Eldridge.

"Q Didn't you attempt to sell to others, try to find someone?

"A He told me I could, but no one wanted it. He told me the agreement was written I could sell it to anyone, but it had to be O.K.'d by him.

"Q But you had written authority to sell to anyone who—

"A I believe it is in the contract, yes, sir.

"Q And you didn't find anyone, and agreed to sell to Eldridge for—

"A (Interrupting) The only thing I could do.

"Q (Continuing)—For Twenty-five hundred dollars."

And again, on cross-examination, when a witness in his own behalf, defendant testified:

"Q There is nothing in there about anybody's right to fire you, is there?

"A No, nothing in writing.

"Q And nobody ever tried to fire you, did they?

"A No, sir.

"Q And when you decided you wanted to go back to Florida, you went to Mr. Eldridge and told him you wanted to quit and wanted to sell your interest in the business, didn't you?

"A Yes, sir.

"Q And he told you to go sell it to anyone you wanted to?

"A Yes, sir.

"Q And you applied to two or three fellows, to see if they wanted to buy it, didn't you?

"A I don't recall anyone I actually tried to sell it to.

"Q Did you talk to Golan Epling about selling it to him?

"A Perhaps I did. I don't recall.

"Q You couldn't find anyone interested in buying your interest in the business?

"A That is right.

"Q Finally Mr. Eldridge said he would give you $2500.00?

"A. Yes.

"Q And you agreed to take that?

"A Yes, sir.

"Q And in connection with it, you signed this contract which is now in evidence before the Court, marked Plaintiffs' Exhibit 'B'?

"A Yes, sir, that is it.

"Q And Mr. Eldridge gave you this check for $2500.00, in evidence as Plaintiffs' Exhibit 'A'?

"A Yes. sir.

"Q And you and your family left and went to Florida?

"A Yes, sir.

"Q And didn't come back until 1949, at least to live?

"A Nineteen forty-eight."

Thus it conclusively appears that defendant was afforded every opportunity to sell his interest to anyone willing to buy. Being unable to find any other purchaser, he finally agreed to sell to Eldridge. The record discloses that for personal reasons he was anxious to sell out and return to Florida. He was in no way coerced into selling at the price agreed upon. It was his own free and voluntary act.

As a part of the sale of his interest in the business, and contemporaneous therewith, defendant entered into the following written agreement with plaintiff D. W. Eldridge:

"THIS AGREEMENT made and entered into this 1st day of December, 1944, by and between D. W. Eldridge, hereinafter referred to as the party of the first part, and Harold Johnston, hereinafter referred to as the party of the second part, WITNESSETH:

"THAT WHEREAS the parties have heretofore been associated together in the meat packing business in La Grande, Oregon, and

"WHEREAS the party of the first part has

purchased the interest of the party of the second part in said business;

"NOW THEREFORE, in consideration of the sum of $1.00 and the purchasing by the party of the first part of the party of the second part's interest in the business in which they were formerly engaged, the party of the second part hereby agrees that he will not engage in the meat or meat packing business, either wholesale or retail, or any branch of such business, either directly or indirectly, either as an owner, manager, salesman or other employee in the states of Oregon or Washington, for a period of ten (10) years from the date hereof, or so long as the party of the first part is engaged in said business in either the states of Oregon or Washington; *the purpose and intention of this agreement being that the party of the second part shall not engage in any business, occupation or pursuit in which his former connection with the party of the first part, the Eldridge Packing Company, or the meat business could be used to gain any advantage or in any manner compete with the business of the party of the first part,* and such agreement shall include the entire states of Oregon and Washington, regardless of whether or not the party of the first part is at the time engaged in business in that particular territory.

"IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals to this and another instrument of the same tenor and date.

"[Sgd.] D. W. Eldridge (SEAL)
Party of the First Part.

[Sgd.] Harold B. Johnston (SEAL)
Party of the Second Part."
(Italics ours.)

It is for the purpose of enforcing the provisions of this agreement against defendant insofar as his conduct of a meat business in the counties of Union, Umatilla, Baker, and Wallowa, in competition with

plaintiffs, is concerned, that this suit was instituted. Plaintiffs pray a decree that defendant "be restrained and enjoined from engaging in the meat packing business either as owner, manager, salesman or other employe in the counties of Union, Umatilla, Baker and Wallowa, Oregon, and from buying livestock in said counties or slaughtering the same or selling meat or products in said counties in competition with the plaintiffs."

In passing, we make note of the fact that defendant did not allege or claim any fraud in connection with the execution by him of either of the contracts to which he is a party. In his brief, defendant mentions some conduct on the part of the plaintiffs which he designates as fraudulent, but that is simply his conclusion. For example, he says "that he was kept in the dark as to the status of the business; and not only was information withheld from him, but actual false statements were made to him as to the status of the business." As a partner, defendant had access to the books of the firm at all times. He was never refused such access, and, even had he been refused, he could have compelled it. Therefore, he was able at all times to obtain first-hand knowledge of the exact status of the business of the company. He was not required to rely upon the statements of anyone respecting such matters. If fraudulent misrepresentations were made to him as an inducement to enter into the contract of December 1, 1944, his answer should have alleged fraud. From a careful examination of the entire record, we are convinced that much of defendant's present contention is wholly an afterthought. He was anxious to sell his interest for cash, and, at the time of the sale, it is clear that he was satisfied with his bargain.

■ One of the principal contentions of defendant on

this appeal is that the consideration for the agreement of December 1, 1944, was so grossly inadequate that equity should refuse to enforce the restrictive covenant contained in the contract. He points out that the actual value of his interest in the business at the time was in excess of $7,500; whereas, he was paid only $2,500 therefor. We repeat that the $7,500 represented the book value only; not necessarily the sales value. Even assuming that the consideration paid was somewhat inadequate, we cannot say that such inadequacy was so gross as to amount in itself to evidence of fraud. And from the record, it is impossible to determine whether the consideration paid was at all inadequate. It will be recalled that defendant was afforded the opportunity to sell his interest to anyone, and that he did attempt to sell it to at least one person who was not a member of the firm. It is obvious that the offer of Eldridge was the best offer which defendant received. He had the right to accept or reject that offer. It is manifest that the price was knowingly and deliberately fixed by the parties.

■ In 3 Pomeroy's Equity Jurisprudence 5th ed, 637, § 927, the rule is stated:

"The following seems to be the true rationale of the doctrines concerning inadequacy of price: Whenever it appears that the parties have knowingly and deliberately fixed upon any price, however great or however small, there is no occasion or reason for interference by courts, for owners have a right to sell property for what they please, and buyers have a right to pay what they please. But where there is no evidence of such knowledge, intention, or deliberation by the parties, the disproportion between the value of the subject-matter and the price may be so great as to warrant the court in inferring therefrom the *fact* of fraud. Such

a gross inadequacy or disproportion will call for explanation, and will shift the burden of proof upon the party seeking to enforce the contract, and will require him to show affirmatively that the price was the result of a deliberate and intentional action by the parties * * *.''

Also see *Biersdorf v. Putnam et al.,* 181 Or 522, 558, 182 P2d 992; *Sherman v. Glick,* 71 Or 451, 461, 142 P 606.

Defendant maintains that the contract of December 1, 1944, is void as being one in unlawful restraint of trade. He contends that the territory covered by the agreement; viz., the states of Oregon and Washington, is so extensive as to render the contract void as against public policy.

■ It is elementary that contracts in general restraint of trade are void and unenforceable. But it is equally well settled that contracts in partial restraint of trade may be enforceable. *Donohue v. Peterson,* 161 Or 65, 87 P2d 770, 122 ALR 1025; *Columbia T. & A. Co. v. Thiele,* 135 Or 511, 295 P 501; *Thompson Optical Institute v. Thompson,* 119 Or 252, 237 P 965; *Coker & Bellamy v. Richey,* 104 Or 14, 202 P 551, 204 P 945, 204 P 947; *Seeck v. Jakel,* 71 Or 35, 141 P 211.

■ Three things are essential to the validity of a contract in restraint of trade: (1) it must be partial or restricted in its operation in respect either to time or place; (2) it must be on some good consideration; and (3) it must be reasonable, that is, it should afford only a fair protection to the interests of the party in whose favor it is made, and must not be so large in its operation as to interfere with the interests of the public. *Cook v. Johnson,* 47 Conn 175, 36 Am Rep 64; *Herreshoff v. Boutineau,* 17 RI 3, 33 Am St Rep 850, 19 A 712, 8 LRA 469.

■ In *Oregon Steam Navigation Co. v. Winsor,* 87 US 64, 20 Wall 64, 22 L ed 315, it is said:

"It is a well-settled rule of law that an agreement in general restraint of trade is illegal and void; but an agreement which operates merely in partial restraint of trade is good, provided it be not unreasonable and there be a consideration to support it. In order that it may not be unreasonable, the restraint imposed must not be larger than is required for the necessary protection of the party with whom the contract is made. * * *"

" * * * * *

"There are two principal grounds on which the doctrine is founded, that a contract in restraint of trade is void as against public policy. One is, the injury to the public by being deprived of the restricted party's industry; the other is, the injury to the party himself by being precluded from pursuing his occupation and thus being prevented from supporting himself and his family. It is evident that both these evils occur when the contract is general, not to pursue one's trade at all, or not to pursue it in the entire realm or country. The country suffers the loss in both cases; and the party is deprived of his occupation, or is obliged to expatriate himself in order to follow it. A contract that is open to such grave objection is clearly against public policy. But if neither of these evils ensue, and if the contract is founded on a valid consideration and a reasonable ground of benefit to the other party, it is free from objection, and may be enforced."

See also *U. S. Chemical Co. v. Provident Chemical Co.,* 64 F 946; *Knapp v. Adams Co.,* 135 F 1008; *Hall Mfg. Co. v. Western Steel & Iron Works,* 227 F 588, LRA 1916C 620; 36 Am Jur, Monopolies, Combinations, etc., 529, § 50, et seq.

 Restrictive covenants such as are contained in the contract now under consideration by this court are usually required for the protection of the good will of the business being sold. Protection of the good will is

the principal, if not the only, justification for the same. In 36 Am Jur, Monopolies, Combinations, etc., 539, § 59, it is stated:

> "Inasmuch as a member of a partnership has an existing interest in the good will of the firm's business, an agreement not to engage in a competing business, made by a retiring member of a firm who sells his interest to the remaining partner, stands on the same footing as a sale of the good will by a merchant or manufacturer. A partnership agreement may validly provide that in the event of a partner's withdrawal from the firm, he shall not engage in the business in which the partnership is engaged. * * *"

 In considering the contract executed by defendant, we are confronted with more than one principle of public policy. It is elementary that public policy requires that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by courts of justice, and it is only when some other over-powering rule of public policy, such as the rule against perpetuities, intervenes, rendering such agreement illegal, that it will not be enforced. This rule respecting the sanctity of contracts is so firmly fixed in our system of jurisprudence that even where the agreement is partly legal and partly illegal, if the legal may be separated from the illegal, the legal part will be enforced.

The contract now before us should be held invalid only if it violates public policy. In early days the geographical limits set in a contract of the character involved in this litigation was a matter of great importance in determining whether or not public policy was violated. But under modern conditions, many state

and English courts have refused to fix geographical limits only within which contracts of this nature can be enforced, and in those jurisdictions the terms "general restraint of trade" and "partial restraint of trade" have no longer a territorial meaning. *Hood v. Legg,* 160 Ga 620, 128 SE 891; *Swigert & Howard v. Tilden,* 121 Iowa 650, 656, 97 NW 82, 63 LRA 608, 100 Am St Rep 374; *Moorman v. Parkerson,* 131 La 204, 59 So 122, Ann Cas 1914A 1150; *Morse Twist Drill & Mach. Co. v. Morse,* 103 Mass 73, 4 Am Rep 513; *Bancroft v. Union Embossing Co.,* 72 NH 402, 57 A 97, 64 LRA 298; *Allen Mfg. Co. v. Murphy,* 22 Ont LR 539, 20 Ann Cas 657; *Underwood v. Barker,* 68 LJ Ch NS 201; 36 Am Jur, Monopolies, Combinations, etc., 543, § 63.

The principal grounds upon which the doctrine that a contract in restraint of trade is void as against public policy is founded, are well stated in *Oregon Steam Navigation Co. v. Winsor,* supra. After stating this doctrine and the grounds therefor, the Iowa Supreme Court in *Swigert v. Tilden,* supra, at page 656 of 121 Iowa, said:

"* * * In view, however, of the ever-changing conditions of trade, commerce, the mechanic arts, etc., and the diversity of interests which obtain in the various states and countries, it must be manifest that there can be no single standard respecting public policy. This is true to the extent that it frequently happens that in certain respects the policy of one state is found to be the exact opposite of that maintained by another; and, even where there is no essential difference in the matter of abstract definition, it may be certain that self-interest, viewed from the standpoint of locality more or less immediate, will enter into and dominate the side of practical application. Now, in this country we have no such conditions as existed when the doc-

trine was first promulgated. In a recent case it has been well said: 'Public policy is a variable test. In the days of the early English cases, one who could not work at his trade could hardly work at all. The avenues to occupation were not as open nor as numerous as now, and one rarely got out of the path he started in. Contracting not to follow one's trade was about the same as contracting to be idle, or to go abroad for employment. But this is not so now. It is an everyday occurrence to see men busy and prosperous in other pursuits than those to which they were trained in youth, as well as to see them change places and occupations without depriving themselves of the means of livelihood, or the state of the benefit of their industry. It would therefore be absurd, in the light of this common experience, now to say that a man shuts himself up to idleness or to expatriation, and thus injures the public, when he agrees, for a sufficient consideration, not to follow some one calling within the limits of a particular state. There is no expatriation in moving from one state to another and from such removals a state would be likely to gain as much as it would lose.' Herreshoff v. Boutineau (R. I.) 19 Atl. Rep. 712 (8 L.R.A. 469, 33 Am. St.Rep. 850). * * *''

It is obvious that the territorial limits fixed in the instant contract in no way prevented defendant from earning a livelihood in his own trade. For his own personal reasons he left the state of Oregon and went to Florida, where he remained for approximately four years. If this state was at all interested in not being deprived of the industry of defendant, and its public policy was violated by being deprived thereof, nevertheless, it appears that for a period of four years the deprivation came from the voluntary act of defendant in his own interests, and not by force of this contract. But in any event, this ground for the doctrine is not present in this case. Neither does the restraint contained in the contract have any tendency to foster

monopolies, enhance prices, nor silence all competition. The interests of the public are in no sense injured, nor are they likely to be injured.

Ordinarily, the principal question to be determined in cases such as this, a good consideration being present, is whether the restriction is reasonable with respect to time and territorial extent, and the answer to this question necessarily depends upon the facts and circumstances of each particular case as it arises. Generally, the question of the reasonableness of the restraint is to be resolved in view of what is reasonably necessary to secure to the buyer the benefits of the business and good will which he has purchased. 36 Am Jur, Monopolies, Combinations, etc., 543, § 63, 544, § 65.

Whether or not the restriction as to time and territorial extent is reasonable must be judged from the standpoint of the time and place when and where the contract is executed, and from the general nature of the business involved.

At the time the instant contract was executed, the business of plaintiffs was expanding as to territory. Their principal customer was Safeway stores, and they sold and delivered meat to branch stores in widely scattered portions of the state of Oregon. It is a matter of common knowledge that Safeway stores operate mercantile establishments in many other states of the Union. In executing this contract, the parties may well have contemplated an extension of plaintiffs' sales to Safeway establishments in the state of Washington. At the time, neither party could foresee how extensive plaintiffs' operations would become. Plaintiffs had a lawful right to provide reasonably for future contingencies. The meat-packing business in its operations is seldom confined to a single locality. Its tendency is

to branch out, gradually covering more and more territory. Many meat-packing organizations operate nationwide, and some world-wide. Under all the facts and circumstances of this case, we cannot say that the territorial limitation fixed in this contract is so unreasonable as to render it void as being against public policy.

 However, it is not necessary to make the limitation applicable to the entire states of Oregon and Washington. Plaintiffs do not seek that. They have confined their request to its application in the four counties of this state in which they are now actually transacting business. These four counties form one compact territory. Even assuming that the geographical limitation covering the entire states of Oregon and Washington is unreasonable, yet the contract is severable, and out of that territorial limitation may be carved a reasonable area in which the covenant of defendant may and should be enforced. A fair interpretation of the contract itself warrants such severance.

It is clear from reading the contract that the primary intent and purpose of the parties was to prevent actual competition by defendant with plaintiffs in the conduct of plaintiffs' business. This is demonstrated by that provision of the contract which sets forth its intent and purpose. It states: ''the purpose and intention of this agreement being that the party of the second part [defendant] shall not engage in any business, occupation or pursuit in which his former connection with the party of the first part, the Eldridge Packing Company, or the meat business could be used to gain any advantage or in any manner compete with the business of the party of the first part.'' This is the real gist of defendant's covenant. Competition is the keynote. This basic purpose of the contract justifies its severance as to territory, and making the limitation appli-

cable in those places where defendant's acts are actually in competition with the business of plaintiffs. Defendant knowingly, voluntarily, and for a good consideration executed a written contract in which he agreed for a limited time to refrain from competition with plaintiffs. He should not be permitted to escape his solemn obligation upon the mere technical theory that the territorial extent named in the contract was in general terms too broad when, without in any manner doing violence to the primary intent and purpose of the contract, but actually in strict compliance therewith, a reasonable territorial area may be severed therefrom.

■■ In 17 CJS, Contracts, 676, § 289a, the following rule is stated:

"If the terms of a contract in restraint of trade can be construed divisibly as to the limits, it may be valid as to the limits which are reasonable, although other limits imposed are excessive, unreasonable, and void. The severability of the contract must be determined from its language and subject matter, and the court cannot create a new agreement for the parties in order to uphold the contract, where the severable character of the agreement is not determinable from the contract itself."

See also *Chesman v. Nainby,* 2 Ld Raym 1456, 92 Reprint 447; *Price v. Green,* 16 M & W 346, 153 Reprint 1222, 6 ERC 406; *Bromley v. Smith,* (1909) 2 KB 235; *Robinson & Co., Ltd., v. Heuer,* 2 Ch 451; *Peltz v. Eichele,* 62 Mo 171, 178; Smith's Appeal, 113 Pa 579, 6 A 251; *Foreman v. Ahl,* 55 Pa 325; *Artistic Porcelain Co. v. Boch,* 76 NJ Eq 533, 74 A 680.

■■ Defendant further maintains that plaintiffs are not entitled to an injunction, because they have failed to prove any actual damages on account of his

acts in violation of the contract. This contention is without merit. Plaintiffs are entitled to have the covenant of the agreement strictly enforced against defendant, and proof of actual damages is not necessary as a condition precedent to injunctive relief. In a case such as this, it is obvious that the amount, and even the fact, of actual damage would be most difficult of ascertainment. 43 CJS, Injunctions, 564, § 84. Furthermore, unless restrained, defendant will continue to violate his agreement. Even if the amount of damages was readily ascertainable for each breach of the contract by defendant, nevertheless, in order to recover for his repeated wrongs, plaintiffs would be compelled to bring a multiplicity of actions at law. Courts of equity will freely grant injunctions to prevent a multiplicity of actions. 43 CJS, Injunctions, 448, § 24. It needs no argument to demonstrate that plaintiffs have suffered, and, if defendant is not restrained, will continue to suffer, irreparable injury from the wrongful conduct of defendant. In such circumstances, equity should and will intervene by injunction to compel defendant to abide by his solemn undertaking. 43 CJS, Injunctions, 446, § 23a, b (1).

The decree of the trial court is reversed and this cause remanded with directions to enter a decree in favor of plaintiffs and against defendant, restraining and enjoining defendant from engaging in the meat or meat-packing business, either wholesale or retail, or any branch of such business, either directly or indirectly, either as an owner, manager, salesman, or other employe in the counties of Union, Umatilla, Baker, and Wallowa, of the state of Oregon, so long as plaintiffs are engaged in said business in either of said counties up to and including November 30, 1954. Neither party shall recover costs.